Gerald Singleton (WA 59010)
gsingleton@singletonschreiber.com
Stephen J. Hill (WA 7651)
shill@singletonschreiber.com
SINGLETON SCHREIBER, LLP
725 N. Stanley Street, Unit C
Medical Lake, WA 99002
Tel. (509) 517-6620

Meagan Verschueren (CA 313117) *Pro Hac Vice applicant*
mverschueren@singletonschreiber.com
Katie Llamas (CA 303983) *Pro Hac Vice applicant*
kllamas@singletonschreiber.com
SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108
Tel. (619) 771-3473

Attorneys for Plaintiff JANE DOE A, JANE DOE B, JANE DOE C, JANE DOE D

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| JANE DOE A, an individual, JANE DOE B individual, JANE DOE C, an individual, JANE DOE D, an individual,<br><br>        Plaintiffs,<br>    v.<br><br>Veer Hospitality Phoenix LLC; SeaTac Hotels, LLC; Evergreen Lodging Group, LLC; Madison Avenue P&L Enterprises, Inc.; G6 Hospitality, L.L.C.; G6 Hospitality IP, L.L.C.; G6 Hospitality Property, L.L.C.; G6 Hospitality Purchasing, L.L.C.; G6 Hospitality Franchising, L.L.C.; Motel 6 Operating, L.P.; HSK212, LLC; Wyndham Hotels and Resorts, Inc.; NITSI, LLC; Choice Hotels International, Inc.; and DOES 1-200, inclusive,<br><br>        Defendants. | Case No.:<br><br>Unlimited Jurisdiction<br><br>**COMPLAINT FOR DAMAGES AND INJURIES**<br><br>**JURY TRIAL DEMANDED**<br><br>**Damages in excess of $100,000** |

## COMPLAINT

COMES NOW the Plaintiffs JANE DOE A, JANE DOE B, JANE DOE C, JANE DOE D by and through the undersigned counsel, and respectfully submits this Complaint for damages and makes the following averments.

## INTRODUCTION

1.      For years, sex trafficking ventures have brazenly operated both online, and in and out of hotels throughout the United States.

2.      For years, major hotel brands have made public claims that they are combatting human trafficking, while at the same time expanding their economy hotels where sex trafficking is most prevalent and profiting from crimes that are perpetrated on their properties. Despite corporate public statements, human trafficking continues to be most prevalent and lucrative in the hotel and hospitality industry.

3.      Criminals parade their misconduct openly on hotel and motel properties throughout the United States, and profit from providing harbor for the underlying assaults. The hotel and hospitality industry continue to create and expand the environment for traffickers to harbor victims and neglect taking reasonable steps to prevent such criminal misconduct, instead choosing to earn a profit at the expense of human life, human rights, and human dignity.

4.      Public appearances and sponsorships do not excuse corporations and individuals that have financially benefited from sex trafficking. In fact, it reveals corporate knowledge of the use of their properties and technology as hubs for human trafficking. The hotel industry has provided the means, environment, and support for human trafficking industry to become the second largest profitable criminal activity in the United States.[1]

---

[1] https://www.mbfpreventioneducation.org/human-trafficking-is-now-the-second-most-profitable-criminal-activity-in-the-united-states/

5.      As the trafficking industry grows, so have Defendants and their profits through the expansion of their properties and rooms rented for this explicit and apparent purpose.

6.      Jane Doe A, Jane Doe B, Jane Doe C, and Jane Doe D file this civil lawsuit seeking compensation for the harm they each suffered as a result of being sex trafficked and sold for sex at hotels owned, operated, maintained, regulated, and controlled by Defendants and their agents and employees.

## PARTIES

7.      Jane Doe A is a natural person who is currently a resident and citizen of Federal Way, King County, Washington. Jane Doe A is a survivor of sex trafficking. From 2012 to 2016 she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

    a.  Due to the sensitive, private, and potentially retaliatory nature of these allegations, this complaint identifies Jane Doe A by a pseudonym only. Jane Doe A will move the court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Jane Doe A's true identity in order to protect Jane Doe A and Jane Doe A's identity.

    b.  Generally, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved may result in retaliation or harm to the Plaintiff.[3] For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

---

[2] Fed. R. Civ. P. 10(a).
[3] See WA Cases e.g., Doe v. Penzato, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); Roe v. St. Louis
Univ., 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009).

c.  In order to maintain her privacy and safety, Jane Doe A should not be compelled to disclose her identity. Jane Doe A's privacy interest substantially outweighs the customary practice of judicial openness.[4] Jane Doe A would be in danger of being forced back into trafficking should her traffickers or their associates learn information about her through publicly filed documents in this action. Additionally, Jane Doe A's life could be put in grave danger should her traffickers or their associates learn information about her through publicly filed documents in this action. Moreover, Defendants will not be prejudiced. Jane Doe A will agree to reveal her identity to Defendants for the limited purpose of investigating Jane Doe A's claims once the parties have entered into a protective order.

8.   Jane Doe B is a natural person who is currently a resident and citizen of Seattle, King County, Washington. Jane Doe B is a survivor of sex trafficking. From 2017-2019 she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

a.  Due to the sensitive, private, and potentially retaliatory nature of these allegations, this complaint identifies Jane Doe B by a pseudonym only. Jane Doe B will move the court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Jane Doe B's true identity in order to protect Jane Doe B and Jane Doe B's identity.

---

[4] See WASHINGTON cases *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

b.  Generally, pleadings must state the name of all parties.[5] However, there are exceptions when the issues involved may result in retaliation or harm to the Plaintiff.[6] For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

c.  In order to maintain her privacy and safety, Jane Doe B should not be compelled to disclose her identity. Jane Doe B's privacy interest substantially outweighs the customary practice of judicial openness.[7] Jane Doe B would be in danger of being forced back into trafficking should her traffickers or their associates learn information about her through publicly filed documents in this action. Additionally, Jane Doe B's life could be put in grave danger should her traffickers or their associates learn information about her through publicly filed documents in this action. Moreover, Defendants will not be prejudiced. Jane Doe B will agree to reveal her identity to Defendants for the limited purpose of investigating Jane Doe B's claims once the parties have entered into a protective order.

9.  Jane Doe C is a natural person who is currently a resident and citizen of Auburn, Pierce County, Washington. Jane Doe C is a survivor of sex trafficking. From 2014 to 2023 she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

---

[5] Fed. R. Civ. P. 10(a).
[6] See WA Cases e.g., Doe v. Penzato, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); Roe v. St. Louis
Univ., 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009).
[7] See WASHINGTON cases *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

a. Due to the sensitive, private, and potentially retaliatory nature of these allegations, this complaint identifies Jane Doe C by a pseudonym only. Jane Doe C will move the court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Jane Doe C's true identity in order to protect Jane Doe C and Jane Doe C's identity.

b. Generally, pleadings must state the name of all parties.[8] However, there are exceptions when the issues involved may result in retaliation or harm to the Plaintiff.[9] For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

c. In order to maintain her privacy and safety, Jane Doe C should not be compelled to disclose her identity. Jane Doe C's privacy interest substantially outweighs the customary practice of judicial openness.[10] Jane Doe C only recently escaped her traffickers and would be in danger of being forced back into trafficking should anyone who knew her trafficker learn information about her through publicly filed documents in this action. Additionally, Jane Doe C's life could be put in grave danger should her traffickers or their associates learn information about her through publicly filed documents in this action. Moreover, Defendants will not be prejudiced. Jane Doe C will agree to reveal her identity to

---

[8] Fed. R. Civ. P. 10(a).
[9] See WA Cases e.g., Doe v. Penzato, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); Roe v. St. Louis
Univ., 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009).
[10] See WASHINGTON cases *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

Defendants for the limited purpose of investigating Jane Doe C's claims once the parties have entered into a protective order.

10.     Jane Doe D is a natural person who is currently a resident and citizen of Seattle, King County, Washington. Jane Doe D is a survivor of sex trafficking. In 2015 she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

    a.  Due to the sensitive, private, and potentially retaliatory nature of these allegations, this Complaint identifies Jane Doe D by a pseudonym only. Jane Doe D will move the court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Jane Doe D's true identity in order to protect Jane Doe D and Jane Doe D's identity.

    b.  Generally, pleadings must state the name of all parties.[11] However, there are exceptions when the issues involved may result in retaliation or harm to the Plaintiff.[12] For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

    c.  In order to maintain her privacy and safety, Jane Doe D should not be compelled to disclose her identity. Jane Doe D's privacy interest substantially outweighs the customary practice of judicial openness.[13] Jane Doe D would be in danger of being forced back into trafficking should her traffickers or their associates learn information about her through publicly filed documents in this

---

[11] Fed. R. Civ. P. 10(a).
[12] See WA Cases e.g., Doe v. Penzato, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); Roe v. St. Louis
Univ., 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009).
[13] See WASHINGTON cases *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

action. Additionally, Jane Doe C's life could be put in grave danger should her traffickers or their associates learn information about her through publicly filed documents in this action. Moreover, Defendants will not be prejudiced. Jane Doe D will agree to reveal her identity to Defendants for the limited purpose of investigating Jane Doe D's claims once the parties have entered into a protective order.

11.     Plaintiff A, Plaintiff B, Plaintiff C, and Plaintiff D will collectively be referred to as "Plaintiffs."

12.     Defendant Veer Hospitality Phoenix LLC is a for-profit Arizona corporation with its principal place of business in Seattle, Washington. Veer Hospitality Phoenix LLC owns and operates the Motel 6 hotel located at 16500 Pacific Highway South, Seattle, Washington.

13.     Defendant SeaTac Hotels, LLC is a for-profit Washington corporation with its principal place of business in SeaTac, Washington. SeaTac Hotels, LLC owned and operated the Motel 6 hotel located at 18900 47th Avenue South, SeaTac, Washington.

14.     Defendant Evergreen Lodging Group, LLC is a for-profit Washington corporation with its principal place of business in Lynnwood, Washington. Evergreen Lodging Group, LLC owns and operates the Motel 6 hotel located at 18900 47th Avenue South, SeaTac, Washington.

15.     Defendant Madison Avenue P&L Enterprises, Inc. is a for profit California corporation with its principal place of business in SeaTac, Washington. Madison Avenue P&L Enterprises, Inc. owns and operates the Motel 6 hotel located at 20651 Military Road South, SeaTac, Washington.

16.     Defendants Veer Hospitality Phoenix LLC, SeaTac Hotels, LLC, Evergreen Lodging Group, LLC, Madison Avenue P&L Enterprises, Inc. will collectively be referred to as "Motel 6 Location Defendants."

17.     Defendant HSK212, LLC is a for-profit Nevada corporation with its principal place of business in Reno, Nevada. HSK212, LLC owned and operated the Hawthorn Suites located at 6329 S 212th Street, Kent, Washington.

18.     Defendant NITSI, LLC is a for profit Washington corporation with its principal place of business in Everett, Washington. NITSI, LLC owned and operated the Quality Inn located at 1711 W Meeker St, Kent, Washington.

       a.  The Quality Inn located at 1711 W Meeker St, Kent, Washington was previously named Days Inn. This location changed from the Days Inn to the Quality Inn in 2014. Despite this name change this location was owned by NITSI, LLC from 2009 to 2022.

       b.  Any reference in this complaint to Quality Inn is in reference to the hotel located at 1711 W Meeker St, Kent, Washington owned, controlled, and operated by NITSI, LLC.

19.     Defendants Veer Hospitality Phoenix LLC, SeaTac Hotels, LLC, Evergreen Lodging Group, LLC, Madison Avenue P&L Enterprises, Inc., HSK212, LLC, and NITSI, LLC will collectively be referred to as "Hotel Defendants."

20.     Defendant G6 Hospitality, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

21.     Defendant G6 Hospitality, IP, LLC is a for profit Delaware corporation with its principal place of business in Carrollton, Texas.

22.     Defendant G6 Hospitality Property, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas. Defendant G6 Hospitality Property, LLC owned and operated the Motel 6 hotel located at 20651 Military Road South, SeaTac, Washington up until 2021.

23.      Defendant G6 Hospitality Purchasing, L.L.C., is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

24.      Defendant G6 Hospitality Franchising, L.L.C. is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

25.      Defendant Motel 6 Operating, L.P., is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas. Defendant Motel 6 Operating, L.P. owned and operated the Motel 6 hotel located at 16500 Pacific Highway South, Seattle, Washington from 2011 to 2022. Defendant Motel 6, Operating, L.P. owns and operates the Motel 6 hotel located at 5201 20th Street E, Fife, Washington.

26.      Defendants, G6 Hospitality, L.L.C., G6 Hospitality IP, L.L.C., G6 Hospitality Property, L.L.C., G6 Hospitality Purchasing, L.L.C., G6 Hospitality Franchising, L.L.C. and Motel 6 Operating, L.P. will collectively be referred to as "G6 Defendants."

27.      G6 Defendants are registered to do business in the State of Washington and may be served at Cogency Global Inc., 1780 Barnes Blvd. SW, Tumwater, Washington 98512.

28.      Upon information and belief G6 Defendants and its brand Motel 6® properties include the locations at 20651 Military Road South, SeaTac, Washington; 16500 Pacific Highway South, Seattle, Washington; 18900 47th Avenue South, SeaTac, Washington; and 5201 20th Street E, Fife, Washington. From 2012 and through 2023, G6 Defendants transacted business in King County, Washington, and purposefully availed itself to King County, Washington, and the citizens of King County, Washington, through Motel 6®.

29.      Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is a for profit Delaware corporation with its principal place of business in Parsippany, New Jersey and can be served through its registered agent in Wilmington, Delaware.

    a.  Wyndham is a corporation that brands, instructs, controls, and contracts with about 9,000 branded properties for profit, including Hawthorn Suites and specifically the Hawthorn Suites where Plaintiff B was trafficked for years.

    b.  Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. Defendant Wyndham Hotels and Resorts, Inc. retained successor liability for wrongful acts of its predecessor Wyndham Worldwide Corporation. Where applicable, references to Wyndham in this complaint also refers to Wyndham Worldwide Corporation.

    c.  Upon information and belief Wyndham Hotels and Resorts, Inc. properties included the Hawthorn Suites at 6329 S 212th Street, Kent, Washington, 98032. From 2017 and through 2019, Wyndham Hotels and Resorts, Inc. transacted business in King County, Washington, and purposefully availed itself to King County, Washington, and the citizens of King County, Washington, through Hawthorn Suites.

30.    Defendant Choice Hotels International, Inc. ("Choice") is a Delaware corporation with its headquarters in Rockville, Maryland and can be served through its registered agent Corporation Service Company, at Wilmington, Delaware.

    a.  Choice is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees.

    b.  Upon information and belief Choice properties included the Quality Inn at at1711 W Meeker St, Kent, Washington. From 2012 and through 2016, Choice transacted business in King County, Washington, and purposefully availed itself to King County

Washington, and the citizens of King County Washington, through Quality Inn.

31.     Defendants, G6 Hospitality, L.L.C., G6 Hospitality IP, L.L.C., G6 Hospitality Property, L.L.C., G6 Hospitality Purchasing, L.L.C., G6 Hospitality Franchising, L.L.C., Motel 6, Inc., Operating, L.P., Wyndham Hotels and Resorts, Inc, and Choice Hotels International, Inc will collectively be referred to as "Parent Hotel Defendants."

## JURSIDCITION AND VENUE

32.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TVPRA").

33.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, led to injuries that occurred in the judicial district where this action is brought.

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the King County, Washington, and all Defendants are registered to do business in Washington.

## SEX TRAFFICKING UNDER FEDERAL LAW

35.     Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[14]

---

[14] 18 U.S.C. §1591; 22 U.S.C. § 7102.

36.     The requirements for liability under the TVPRA on a beneficiary theory can be stated as follows: (1) the person or entity "knowingly benefits, financially or by receiving anything of value" (2) "from participating in a venture" (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

37.     "Sex trafficking" is defined by the TVPRA under 22 U.S.C. § 7102(12) as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

38.     The term "severe forms of trafficking in persons" includes "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age." 22 U.S.C. § 7102(11).

<u>**FACTUAL ALLEGATIONS**</u>

<u>**Sex Trafficking of Plaintiff A**</u>

39.     Starting in 2012, Plaintiff A was subjected to sex trafficking at the Motel 6 at 20651 Military Road South, Seattle, Washington; 16500 Pacific Highway South, Seattle, Washington; 18900 47th Avenue South, Seattle, Washington; and Quality Inn located at 1711 W Meeker St, Kent Washington.

40.     For approximately four years, Plaintiff A's trafficker rotated between these hotels. These hotels were used by Plaintiff A's trafficker for days at a time, encountering the same staff.

41.     Plaintiff A's trafficker would use the same named locations so often that she started to quickly recognize staff. The front desk and other staff would consistently see Plaintiff A with her trafficker and would have realized they kept returning and exhibiting red flags of trafficking.

42.     A security guard worked at the Motel 6 located at 20651 Military Road S, Seattle Washington, and it was clear that he was friendly with Plaintiff A's

trafficker. At one point, the security guard even tried to set up a "date" with her to benefit from her trafficking.

43.     During this time Plaintiff A was under the control of her trafficker and endured multiple beatings, threats and manipulation. Plaintiff A was beaten so frequently by her trafficker that she often had a busted lip and black eyes. Plaintiff A's trafficker would pistol whip her and leave visible markings. Plaintiff A was burned with cigarettes and left with multiple scars all over her body that were visible to Defendants during her frequent stays. Additionally, Plaintiff A was often strangled at these locations.

44.     Plaintiff A had her teeth knocked out on multiple occasions during her time of trafficking. Again, these were all injuries visible to Defendants and/or their agents.

45.     Plaintiff A's trafficker always had a gun with him and would put it to her head often to threaten and intimidate her.

46.     At all the hotel locations named, Plaintiff A's trafficker would not allow the cleaning crew in to clean the room or change out linens or towels. Instead, the trafficker or Plaintiff A would ask for an extraordinary amount of linens and towels throughout their stays.

47.     While staying at the subject Hotel Defendants' locations, Plaintiff A's trafficker would post advertisements online offering Plaintiff A for commercial sex acts to take place at the Hotels and communicated with "johns" responding to the advertisements. While staying at the subject Hotel Defendant locations, Plaintiff A was forced to take well over five (5) dates per day at all hours.

48.     With each stay at the subject Hotel Defendants' locations, it resulted in several consistent red flags, including but not limited to: paying for stays in cash; paying for extended stays on a day-to-day basis; requesting certain rooms away from other guests; obvious signs of illegal drug use; frequent requests for clean

linens or towels; unusually large numbers of used condoms in the trash; unusually large numbers of male visitors going in and out of Plaintiff A's room at all times during the day and night; visible signs of physical abuse; women wearing clothing inappropriate for the weather; and loud noises of abuse and other violence audible to staff and/or other rooms.

49.    These red flags were open and obvious to anyone working at the subject Hotel Defendant locations and lasted for four years.

**Sex Trafficking of Plaintiff B**

50.    Starting in 2017, Plaintiff B was subjected to sex trafficking at the Motel 6 at 20651 Military Road South, Seattle, Washington; 16500 Pacific Highway South, Seattle, Washington; 18900 47th Avenue South, Seattle, Washington; and Hawthorn Suites by Wyndham at 6329 S 212 Street, Kent, Washington.

51.    Plaintiff B was forced into trafficking when she was taken at gunpoint by her trafficker while waiting outside a convenience store. She was forced into the car and taken to the Motel 6 located at 20651 Military Road South, Seattle, Washington where she was held for approximately one week at gunpoint. The trafficking started almost immediately. When her trafficker first checked into this hotel Plaintiff B stood next to him while at gunpoint, looking terrified.

52.    Plaintiff B would often check in at the front desk with her trafficker and she looked scared, timid, nervous, and sad.

53.    For approximately two years, Plaintiff B's trafficker rotated between these hotels. These hotels were used by Plaintiff B's traffickers for days at a time, encountering the same staff.

54.    During this time Plaintiff B was under the control of her trafficker and endured multiple beatings, threats and manipulation. Plaintiff B was often physically abused.

55.     During her trafficking she was shot in the leg while at the Motel 6 located at 18900 47th Avenue South, SeaTac, Washington. Her trafficker continued to force her to have commercial sex. Her Trafficker forced her to wrap her leg and continue having commercial sex. He did not allow her to seek medical assistance, her gunshot wound got infected and left a scar because of the lack of medical treatment. The gun shot would have been heard and Plaintiff B would have been seen limping around at each of the Defendant Hotel Locations after she was shot.

56.     Plaintiff B was burned multiple times with a cigarette, leaving her with visible wounds and eventual scars.

57.     Plaintiff B was consistently beaten by her trafficker, which left visible bruises and marks on different parts of her body.

58.     Plaintiff B's trafficker would threaten to hurt or kill her family if she did not comply with his demands.

59.      One of the other girls with Plaintiff B's traffickers was shot in the mouth, giving Plaintiff B even more reason to be terrified of and controlled by fear of her trafficker.

60.     Plaintiff B managed to escape her trafficker one time but was quickly found, taken hostage again and the trafficking continued at the subject hotels listed herein.

61.     Plaintiff B's Trafficker would often get two rooms and/or request certain rooms at each hotel.

62.     At the Hawthorn Suites by Wyndham at 6329 S 212 Street, Kent, Washington, Plaintiff B's trafficker knew someone working at the front desk. Plaintiff B's trafficker just had to call this employee directly to get the room and not check in at the front desk.

63.     While staying at the subject Hotel Defendants' locations, Plaintiff B's trafficker would post advertisements online offering Plaintiff B for commercial sex

acts to occur at the Hotels and communicated with "johns" responding to the advertisements. While staying at the subject Hotel Defendant locations, Plaintiff B was forced to take multiple dates per day at all hours of the day and night.

64.     With each stay at the subject Hotel Defendant locations, it resulted in several consistent red flags, including but not limited to: paying for stays in cash; paying for extended stays on a day-to-day basis; requesting certain rooms away from guests; obvious signs of illegal drug use; frequent requests for clean linens or towels; unusually large numbers of used condoms in the trash; unusually large numbers of male visitors going in and out of Plaintiff B's room at all times during the day and night; visible signs of physical abuse; women wearing clothing inappropriate for the weather; loud noises of abuse and other violence audible to staff and/or other rooms.

65.      These red flags were open and obvious to anyone working at the subject Hotel Defendants' locations and lasted for two years.

**Sex Trafficking of Plaintiff C**

66.     Starting in 2014, Plaintiff C was subjected to sex trafficking at the Motel 6 at 20651 Military Road South, Seattle, Washington; 16500 Pacific Highway South, Seattle, Washington; and 18900 47th Avenue South, Seattle, Washington.

67.     For approximately nine years, Plaintiff C's trafficker rotated between these hotels. These hotels were used by Plaintiff C's trafficker for days at a time, encountering the same staff.

68.     During this time Plaintiff C was under the control of her trafficker and endured multiple beatings, threats, and manipulation. Plaintiff C was often physically abused. During her trafficking, Plaintiff C's trafficker found out she was trying to leave him, and he shot her in the arm. An injury that would have been visible to Defendants and/or their agents.

69.     Plaintiff C was often beaten. On one occasion Plaintiff C's trafficker struck her with a hammer on her head, leaving visible marks and scaring.

70.     With each stay at the subject Hotel Defendant locations, it resulted in several consistent red flags, including but not limited to: paying for stays in cash; paying for extended stays on a day-to-day basis; requesting certain rooms away from other guests; obvious signs of illegal drug use; frequent requests for clean linens or towels; unusually large numbers of used condoms in the trash; unusually large numbers of male visitors going in and out of Plaintiff C's room at all times during the day and night; visible signs of physical abuse; women wearing clothing inappropriate for the weather; loud noises of abuse and other violence audible to staff and/or other rooms.

71.      These red flags were open and obvious to anyone working at the subject Hotel Defendants' locations and lasted for nine years.

**Sex Trafficking of Plaintiff D**

72.     Starting in 2015, Plaintiff D was subjected to sex trafficking at the Motel 6 at 18900 47th Avenue South, Seattle, Washington; and 5301 20th St E, Fife, Washington.

73.     For approximately two months Plaintiff D's trafficker rotated between these two hotels. These hotels were used by Plaintiff D's traffickers for days at a time, encountering the same staff.

74.     There was often yelling and arguments that would take place at the subject locations. Plaintiff D's trafficker was physically abusive and would threaten her. Plaintiff D feared for her life.

75.     Plaintiff D was often drugged by her trafficker and was controlled by her trafficker as she was taken from hotel to hotel, not coherent.

76.     Plaintiff D's trafficker would leave the room and wait outside the hotel rooms while she was forced to perform the commercial sex acts. Her trafficker would then come back into the room once the "john" left.

77.     Plaintiff D's trafficker would leave visible marks on her from each beating she endured.

78.     During this time at the subject locations, Plaintiff D was under the control of her trafficker. Plaintiff D's trafficker was always nearby and watching her. Plaintiff D was forced to keep her head down and not look at or interact with anyone. She would often look scared and timid.

79.     With each stay at the two subject Motel 6 locations listed above, it resulted in several consistent red flags, including but not limited to: paying for stays in cash; paying for extended stays on a day-to-day basis; requesting certain rooms away from guests; obvious signs of illegal drug use; frequent requests for clean linens or towels; unusually large numbers of used condoms in the trash; unusually large numbers of male visitors going in and out of Plaintiff D's room at all times during the day and night; visible signs of physical abuse; women wearing clothing inappropriate for the weather; loud noises of abuse and other violence audible to staff and/or other rooms.

80.      These red flags were open and obvious to anyone working at the subject Hotel Defendants' locations and lasted for two months.

**The Hotel Industry's Role in Sex Trafficking**

81.     In 2017, human trafficking was noted as the world's fastest growing crime.[15] While the term "human trafficking" incorporates all forced labor, the sex

---

[15] Human Trafficking is the World's Fastest Growing Crime. May 22, 2017. The Advisory Board. Available at:
https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking

trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.[16]

82.     The hospitality industry plays a crucial role in the sex trade.[17] Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Despite the known risks and known trafficking crimes, Hotels, including the Defendants, offer anonymity and non-traceability to the traffickers, making them ideal venues for crime and sex trafficking in particular. Hotels, including the Defendants, knowingly harbor traffickers, buyers, and victims.

83.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[18] For years, sex traffickers have "been able to reap their profits with little risk when attempting to operate within hotels."[19]

84.     According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur. Traffickers and buyers alike frequently use hotel rooms to exploit victims.

---

[16] Profits and Poverty: The Economics of Forced Labor. May 24, 2014. International Labor Organization. Available
at: http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index htm.
[17] Cavagnaro, Giovanna L. C. 2017. Sex Trafficking: The Hospitality Industry's Role and Responsibility. Cornell
University School of Hotel Administration. Available at:
http://scholarship.sha.cornell.edu/honorstheses/3.
[18] This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune (April 2019),
https://fortune.com/2019/04/14/human-sex-trafficking-us- slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.
[19] See Human Trafficking in the Hotel Industry, Polaris Project (Feb. 10, 2016),
https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; see also Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

85.     In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.  Hotels have been found to account for over 90% of commercial exploitation of children.

86.     Due to the overall hospitality industry's complacency, complicity, and reckless disregard in addressing the known issue of sex trafficking, hotels are the venue of choice for sex trafficking.  Traffickers and buyers capitalize on the hotel industry's general refusal to (1) adopt and enforce companywide anti-trafficking policies from the corporate to the property level, (2) train staff on what to look for and how to respond, and/or (3) establish safe and secure reporting mechanisms for those at the point of sale.

87.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

88.     Hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation and should be held accountable when they fail to comply. As stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."

89.     Even estimates by attorneys for the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[20] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.

---

[20] U.S. Dep't of State. 2016. 2016 Trafficking in Persons Report, at 387. Available at: https://www.state.gov/documents/organization/258876.pdf.

90.     The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with certain hotel chains, including the Hotel chains named in this complaint — they know it is unlikely that they will be disturbed.

91.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

92.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Washington Attorney General, Love 146, and EPCAT, among numerous others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[21]

93.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of and were aware or should have been aware of at all subject times of the trafficking alleged herein, are specific to the hotel industry. These include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

---

[21] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b. Individuals show signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e. Individuals lack freedom of movement or are constantly monitored;

f. Individuals avoid eye contact and interaction with others;

g. Individuals have no control over or possession of money or ID;

h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i. Individuals have few or no personal items—such as no luggage or other bags;

j. Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k. A group of girls appears to be traveling with an older female or male;

l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n. Possession and presence of bulk sexual paraphernalia such as condoms or lubricant;

o.   Possession or use of multiple cell phones; and

p.   Possession or use of large amounts of cash or pre-paid cards.

94.     At all times of trafficking alleged herein, Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking and should have seen signs of the sex trafficking of Plaintiffs that were observable by Defendants.

95.     Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, including the subject properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

96.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of Defendants to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels, is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

**Parent Hotel Defendants' Control Over Their Hotel Defendant Locations**

97.     Parent Hotel Defendants are vicariously liable for the acts, omissions, and knowledge of their Hotel Defendants and staff of the Hotel Defendant locations named herein, which are Parent Hotel Defendants' actual agents or subagents.

98.     Upon information and belief, it is a standard practice in the hospitality industry, followed by all Defendants, for Parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall

be served, to the number of pillows that are placed on the beds, to the types of payments accepted, to when, where, and how guests are greeted.

99.     Parent Hotel Defendants provide their Hotel Defendants with signage on and in front of the building. This is done to assure customers that when they check in, they can expect an experience consistent with the standards of the Parent Hotel Brand. This brand logo is displayed on everything in the hotel, such as pens and paper on the bedside table and staff uniforms worn at the front desk during check in.

100.    Parent Hotel Defendants provide their hotel branded locations brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online agency databases. They also provide access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Therefore, bookings and room reservations are primarily controlled by Parent Hotel Defendants.[22]

101.    Parent Hotel Defendants subject Hotel Defendants to detailed standards and requirements regarding the operation of the Hotel Defendant locations named herein through the franchising agreements, detailed written policies and manuals and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the Parent Hotel Defendants.

102.     Upon information and belief, Parent Hotel Defendants require their branded Hotel Defendants' properties to use a property management system. This system is linked to the Parent Hotel Defendants' corporate network and data center. This is to, among other things, receive reservations, and process payment transactions.

---

[22] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), The Origins and Growth of Franchising in the Hotel Industry (lodgingmagazine.com).

103.    Upon information and belief, per the relevant franchise agreements, Parent Hotel Defendants may enforce their brand standards through periodic inspections of the hotel locations, backed up with the ultimate threat of termination of the agreement.[23]

**Motel 6 Location Defendants and Staff Acted as Actual Agents of G6 Defendants**

104.    G6 Defendants are vicariously liable for the acts, omissions, and knowledge of their Motel 6 Location Defendants and staff of the locations named herein, which are G6 Defendants' actual agents or subagents.

105.    G6 Defendants subjected Motel 6 Location Defendants to detailed standards and requirements regarding the operation of the Motel 6 locations named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the G6 Defendants.

106.    G6 Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that G6 Defendants imposed on the franchisees:

> a.   Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Motel 6 Location Defendants used at their Motel 6 locations;
>
> b.   Covered virtually all aspects of hotel operations, including internal operating functions;

---

[23] Many of the franchise disclosure documents, which outline the policies and procedures of franchise agreements can be accessed publicly on https://fddexchange.com/view-fdd-docs.

    c.  Dictated the specific manner in which Motel 6 Location Defendants and hotel staff must carry out most day-to-day functions at their Motel 6 locations; and

    d.  Significantly exceeded what was necessary for G6 Defendants to protect its registered trademarks.

107.    In addition to the ways described above, upon information and belief, G6 Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendants' day-to-day operation of the subject Motel 6 locations named herein, including the following ways:

    a.  G6 Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for G6 Defendants to protect their registered trademarks;

    b.  G6 Defendants provided training for hotel management and select hotel staff on-site at the Motel 6 locations selected by G6 Defendants;

    c.  G6 Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

    d.  G6 Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

    e.  G6 Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that franchisees were required to purchase to operate the Motel 6 locations named herein, G6 Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g. G6 Defendants required franchisees to sign a technology agreement governing the terms under which franchisees must procure and use technical services and software while operating the Motel 6 locations named herein. Motel 6 Location Defendants were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. G6 Defendants set required staffing levels for the Motel 6 locations named herein;

i. G6 Defendants established detailed job descriptions for all positions in its Motel 6 properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. G6 Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

k. G6 Defendants provided benefits for employees of franchised hotels;

l. G6 Defendants required Motel 6 Location Defendants to use a customer resource management program maintained and operated by the G6 Defendants;

m. G6 Defendants controlled channels for guests to report complaints or provide feedback regarding the Motel 6 locations and directly

participated in the response and/or supervised the response to customer complaints or other feedback. G6 Defendants retained the right to provide refunds or other compensation to guests and to require Motel 6 Location Defendants to pay associated costs;

n.  G6 Defendants generated reports and analysis of guest complaints and online reviews for the subject Motel 6 locations;

o.  G6 Defendants required Motel 6 Location Defendants to use a Guest Relations Application owned, operated, and maintained by G6 Defendants to manage all guest data and information. G6 Defendants could use the backend of this system to analyze data and generate reports;

p.  G6 Defendants set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisees and to bill franchisees directly for that insurance if G6 Defendants determine that the franchisees have not purchased adequate insurance;

q.  G6 Defendants regularly audited the books and records of Motel 6 Location Defendants;

r.  G6 Defendants conducted frequent and unscheduled inspections of Motel 6 properties, including the Motel 6 locations named herein;

s.  G6 Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisees violated any of the G6 Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Motel 6 locations named herein;

t. G6 Defendants controlled all marketing for subject Motel 6 locations and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the G6 Defendants;

u. G6 Defendants imposed detailed recordkeeping and reporting requirements on Motel 6 Location Defendants regarding virtually all aspects of hotel operations;

v. G6 Defendants supervised and controlled day-to-day operations of the Motel 6 locations named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required Motel 6 Location Defendants to use; and

w. G6 Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

## Hawthorn Suites Defendant and Staff Acted as Actual Agents of Wyndham Hotels and Resorts, Inc.

108.    Wyndham Hotels and Resorts, Inc. is vicariously liable for the acts, omissions, and knowledge of Hawthorn Suites located at 6329 S 212th Street, Kent, WA, 98032 and the staff of this location named herein, which are Wyndham Hotels and Resorts, Inc's actual agents or subagents.

109.    Wyndham exercises day-to-day control over Wyndham branded properties through centralized corporate systems, training policies, and brand standards. This includes the property located at 6329 S 212th Street, Kent, Washington, where Plaintiff B was trafficked.

110.    Wyndham implements and retains brand hotel control over the Hawthorn Suites located at 6329 S 212th Street, Kent, Washington, where Plaintiff B was trafficked.

111.    Upon information and belief, Wyndham controls the operations of its branded properties in various ways, which is enforced through franchise agreements and other related contracts, including but not limited to:

    a. Requiring locations to use Wyndham's property management system;

    b. Requiring locations to keep audit reports and other records;

    c. Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

    d. Gathering reports of data from branded locations.

    e. Requiring locations to report data on customer feedback;

    f. Regulating policies and procedures of their locations;

    g. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security and filtering;

    h. Providing training and orientation materials for their branded property staff;

    i. Regulating the room rental rates; and

    j. Insurance coverage requirements.[24]

112.    Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, cleanliness, and/or other hotel brand policies published

---

[24] See Franchise Disclosure Document https://fddexchange.com/wp-content/uploads/2014/03/Days-Inn-FranchiseDisclosure-Document-FDD-July-12-2012.pdf. Days Inn is a Wyndham owned property with similar franchise agreements.

and communicated through property management systems with back-end management by Wyndham. [25]

113.    Through its national sales team, Wyndham controls the credit processing system and the centralized direct billings at its brand hotels.

114.    Wyndham is the employer of the staff at its branded properties. Wyndham posts all hotel jobs on its parent website.[26] Wyndham is also responsible for setting the values and culture for all Wyndham employees.[27]

**Quality Inn Defendant and Staff Acted as Actual Agents of Choice Hotels International, Inc.**

115.    Choice Hotels International, Inc. is vicariously liable for the acts, omissions, and knowledge of Quality Inn located at 1711 W Meeker St, Kent, Washington and the staff of this location named herein, which are Choice Hotels International, Inc's actual agents or subagents.

116.    Choice Hotels International, Inc. exercises day-to-day control over the Quality Inn and its other brand hotels through centralized corporate systems, training, policies and brand standards.

117.    Upon information and belief, Choice Hotels International, Inc controls the operations of its branded properties through various means enforced through franchise agreements and other related contacts. Some examples of how Choice Hotels International, Inc does this are:

    a.  Gathering reports of data generated by branded locations. This includes reservation, payment, occupancy information through Choice's centralized systems;

---

[25] *Our Brands, WYNDHAM HOTELS*, https://www.wyndhamhotels.com/Wyndham-rewards/ourbrands (last visited Aug 8, 2024).

[26] *Join the Wyndham Family*, https://careers.syndhamhotels.com/ (last visited Aug 8, 2024).

[27] About Wyndham, Wyndham https://careers.wyndhamhotels.com/content/about-wyndham/#culture (last visited Aug 8, 2024)

     b.   Requiring each location to keep audit reports and other records;

     c.   Each location must use Choice's property management system;

     d.   Regular inspections to ensure compliance with agreements;

     e.   Providing marking requirements and standardized marketing services for each location;

     f.   Regulating policies and procedures;

     g.   Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

     h.   Providing training and orientation materials for branded property staff;

     i.   Insurance coverage requirements;

     j.   Regulating room rates.[28]

118.    Choice Hotels International, Inc. manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, internet access, cleanliness and other hotel brand related policies.[29]

119.    Choice Hotels International, Inc requires its branded properties to comply with its corporate polices relating to security and safety, human rights, ethics, corporate governance, and compliance with the law.[30]

120.    Choice gathers data from its customers including names, payment information, reservation history, browsing data, and other details associated with stays.[31]

---

[28] See Quality Inn 2022 Franchise Disclosure Document, https://fddexchange.com/view-fdd-quality-inn-2022-fdd-franchise-information

[29] Why Choice?, Why Choice Hotels - Choice Hotels Development (last visited Aug 8, 2024).

[30] See *Human Rights Policy*, Human Rights Policy Statement - Choice Hotels International (last visited Aug 8, 2024).

[31] Choice Hotels International, Inc. *Privacy and Security,* Choice Hotels Privacy and Security Policy (last visited Aug 8, 2024).

**Parent Hotel Defendants Knowingly Benefited from Participation in a
Venture with Their Franchisee Locations**

121.    Hotel brands own properties and lend their name and likeness to third
party owners, while the building and operations are under the brands' supervision
and control. This is done through brand standards, franchise agreements, and
maintaining control over all aspects of operations. This allows the parent brand to
exchange the high risk that is inherent in owning an asset like a hotel for the low
risk associated with owning a local property or franchise contract and still profit.
Because of this, the hotel locations and parent brands—here G6 Defendants and
Motel 6 Location Defendants; Wyndham Hotels and Resorts, Inc and Hawthorn
Suites; and Choice Hotels International, Inc and Quality Inn—are inextricably
intertwined.

122.    The average customer does not see this relationship. The parent brand
gives the franchisee property its identity. The parent brand provides the signage
that assures customers that if they check into that hotel they can expect the
standards consistent with the parent brand. The parent companies – G6
Defendants, Wyndham, and Choice—hold themselves out to the public as the
owners of the property. These brand requirements are contractual with the power to
control weighed heavily toward the corporate parent brand.

123.    At all times of trafficking alleged herein and currently, booking and
room reservations are controlled by the corporate parent brand.[32]

124.    Upon information and belief, at all times of trafficking alleged herein
and currently, the franchised hotels, typically pays a percentage of their total
revenue back to the parent company and is required to develop and maintain the

---

[32] Meyer, Ellen, April 10, 2018. *The Origins and Growth of Franchising in the Hotel Industry.* Lodging Magazine.

property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

125.    Upon information and belief, per the franchise agreements, the Parent Hotel Defendants, may enforce standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the Parent Hotel Defendants to enforce their brand standards, including safety standards, is not just their right but their responsibility.

126.    At all times of trafficking alleged herein, Parent Hotel Defendants dictated franchisee policies related to safety, security, human trafficking, employee training and franchisee's response.

127.    Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject motels passed through a system operated and managed by the parent companies—G6 Defendants, Wyndham Hotels and Resorts, Inc, and Choice Hotels International, Inc.

128.    Defendants profited from the sex trafficking of Plaintiffs when they rented rooms to Plaintiffs and/or their traffickers when they knew or should have known that human trafficking was occurring.

129.    Defendants benefited from the steady stream of income that Plaintiffs' traffickers brought to their hotels and hotel brands. Defendants profited from each and every room that Plaintiffs' traffickers rented where Plaintiffs were harbored and maintained for the purpose of sex trafficking.

130.    Defendants facilitated the trafficking through its practices, policies, and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including Plaintiffs, for sex so they could continue to profit from the room rentals, and business that trafficking brings.

131.    Parent Hotel Defendants owned and operated the subject properties while buyers paraded in and out of rooms rented for the purpose of trafficking

Plaintiffs. Their employees and agents observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiffs. Their employees and agents observed or should have observed the trafficking occurring regularly and for multiple days at a time at the subject hotel locations but ignored it so they could profit.

132.     Plaintiff's trafficking at the subject hotel locations was a result of Parent Hotel Defendants' and Hotel Defendants' participation in a venture with each other and criminal traffickers. If Parent Hotel Defendants and Hotel Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Plaintiffs' trafficking at the subject hotel locations.

133.     Despite its actual or constructive knowledge that the venture it was engaged in was in violation of 18 U.S.C. §§1591(a), and 1595(a) through the conduct of hotel staff and the widespread trafficking at the subject hotel locations named herein, Parent Hotel Defendants participated in the venture by continuing to associate with the hotel staff and with other Hotel Defendants to operate the hotel locations named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. § 1591(a) including trafficking of victims like Plaintiffs.

134.     Parent Hotel Defendants and Hotel Defendants financially benefitted from renting hotel rooms to Plaintiffs and Plaintiffs' traffickers on numerous occasions.

135.     Parent Hotel Defendants participated in this venture through the conduct described herein as they were jointly responsible for relevant aspects of hotel operations.

**Hotel Defendants Facilitated Trafficking of Plaintiffs**

136.    Hotel Defendants had both actual and constructive knowledge of the trafficking of Plaintiffs at the hotel locations they owned and operated because the trafficking was the direct result of Hotel Defendants facilitating their trafficking at the subject locations.

137.    Hotel Defendants are responsible for the acts, omissions, and knowledge of all employees of the subject hotel locations when operating the hotel because these acts and omissions were committed in the course and scope of employment. Hotel Defendants ratified these acts and omissions because Hotel Defendants failed to exercise reasonable care in the hiring, training, and supervision of these employees given the specific risks known and reported to Hotel Defendants of sex trafficking occurring that the subject hotel locations.

138.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject locations, Hotel Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

139.    Hotel Defendants knew or were willfully blind to the fact that Plaintiffs were being trafficked and, despite this, benefited from continued association with their traffickers by providing them with a venue in the form of hotel rooms and related services, to harbor and facilitate Plaintiffs' sexual exploitation.

140.    Hotel Defendants also facilitated widespread trafficking at their hotel locations, including the trafficking of Plaintiffs in ways including:

      a.   Allowing inappropriate and inadequate practices for hiring, training, supervising, managing and disciplining front line staff regarding issues related to human trafficking;

      b.   Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c.  Choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, laws, and/or applicable franchisor policies and procedures; and

d.  Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**Parent Hotel Defendants Facilitated the Trafficking of Plaintiffs at the Hotel Defendant Locations**

141.    Upon information and belief, during the times Plaintiffs were trafficked at the subject properties, Parent Hotel Defendants participated directly in aspects of the operation of those subject hotels that influenced whether and to what extent trafficking offered at the hotels, including but not limited to the trafficking of Plaintiffs as follows:

a.  Parent Hotel Defendants assumed responsibility and control over the human trafficking response of their subject motel properties, including design and implementation of practices to prevent trafficking, safety, and security procedures, employee, and franchisee education, training and response, partnership with external organizations, and advocacy;

b.  Parent Hotel Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in their branded hotel locations;

    c.   Parent Hotel Defendants retained control over determining which hotels needed additional training or other resources on the risk of trafficking occurring and other related criminal activity;

    d.   Parent Hotel Defendants retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

    e.   Parent Hotel Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives it, and the consequences of someone not participating or failing to follow such training; and

    f.   Parent Hotel Defendants retained control over setting, supervision, overseeing, and enforcement policies and procedures for housekeeping services at the subject motel locations, including how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

142.    As a direct and proximate result of these egregious practices on the part of the Parent Hotel Defendants, Plaintiffs and victims of sex trafficking and exploitation have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## **Defendants' Knowledge of Sex Trafficking at Their Locations**

143.    Defendants' knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Defendants have known, since well before any of the named Plaintiffs were trafficked, that sex trafficking was ongoing and widespread at their branded properties, including the subject properties named herein.

144.    Use of the Parent Hotel Defendants' branded properties for sex trafficking is well known to Defendants. Upon information and belief, before and at the time Plaintiffs were trafficked at the subject Hotel Defendant locations properties, each of the Hotel Defendants monitored criminal activity occurring at the branded hotels and were aware of activity indicating commercial sex, sex trafficking, and related crimes occurring at those branded hotels, including the specific hotel properties where Plaintiffs were trafficked.

145.    Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their brand properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs"; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms victims were trafficked in without ID; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking or taking any steps to prevent or stop it.

146.    Defendants have access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

147.    Information that has become public through news stories establishes the entrenched and pervasive nature of Defendants' role in providing a venue where

sex trafficking has continued unabated for years. Defendants have provided the means necessary for traffickers to traffic victims, including Plaintiffs.

148.    During the period Plaintiffs were trafficked at the subject locations named herein, there were obvious signs that their traffickers were engaged in sex trafficking.

149.    Other girls were trafficked at the same hotels at the same time as Plaintiffs.

150.    Plaintiffs' traffickers were often present with Plaintiffs at check in and would linger around the hotel or in the parking lot while Plaintiffs were forced to have sex with customers at the subject hotels. This was all in plain sight of Defendants' employees at the subject locations. Plaintiff's traffickers could be seen leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day, every day, for years.

151.    There was heavy foot traffic in and out of the rooms where Plaintiffs were being harbored. This foot traffic involved men who were not hotel guests. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time. Their comings and goings were visible to hotel employees that were located at front desks and around the property. A reasonable hotel would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen it by and through their employees and agents.

152.    There were obvious signs of trafficking consistent with trafficking and which included well known "red flags" for trafficking in a hotel, such as condoms, sex paraphernalia, and lingerie. These things were not only visible to but must have been seen by hotel employees entering and cleaning the rooms or even just collecting the trash.

153.     When forced and coerced into coming and going from the subject motel locations, Plaintiffs looked unhealthy, unhappy, abused, and scared. Their traffickers were always watching them, and their noticeable demeanor was visible to hotel employees they passed by.

154.     Upon information and belief, multiple employees at the subject hotel locations named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

155.     As such, Defendants knew or were willfully blind to the fact that Plaintiffs were being trafficked at the subject motel locations named herein.

156.     A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which Defendants have long received and continue to receive evidence and reports that human trafficking is a known issue at their hotel locations.

## 1.   G6 Defendants and Motel 6 Location Defendants' Knowledge of Sex Trafficking at Their Locations

157.     A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that G6 Defendants paid to settle a public nuisance lawsuit related to such trafficking filed by the City of Los Angeles.[33]

158.     The Los Angeles nuisance settlement required G6 Defendants to change policies that were facilitating sex trafficking.[34] G6 Defendants knew from that lawsuit, from many prior lawsuits, and from their personal knowledge about sex trafficking at their properties that their policies were facilitating sex trafficking. Based on information and belief, at all times relevant in this Complaint and

---

[33] Motel 6 pays $250,000 to settle human trafficking suit (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.
[34] *Id.*

currently, G6 Defendants have failed to adequately implement and enforce such changes.

159.    Public statements of G6 Defendants confirm that they knew before and during the sex trafficking of Plaintiffs that sex trafficking is a problem in the hotel industry, sex trafficking was occurring at their branded hotels, and that they retained control over the response of their branded hotels to this problem. G6 Defendants recognized that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[35] They also acknowledged the significant role G6 Defendant have in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels.[36]

160.    G6 Defendants acknowledge on its website that it controls the policies, procedures, training, and codes of conduct that have facilitated sex trafficking at its Motel 6 Brand hotels, including the subject Hotel Defendants' properties where Plaintiffs were trafficked and abused.[37]

161.    G6 Defendants acknowledge on its website that it controls the policies, procedures, training, and codes of conduct that have facilitated sex trafficking at its branded hotels.[38]

162.    Among some of the notable press involving frequent use of G6 hotels for illegal trafficking activity, the following was noted:

  a. In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten (10) times per day.[39]

---

[35] G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf
[36] *Id.*
[37] https://g6hospitality.com/combating-human-trafficking/
[38] *Id.*
[39] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105

b. In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[40]

c. In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[41]

d. From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[42]

e. Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[43]

f. The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[44]

g. The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[45]

---

[40] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[41] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[42] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

[43] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[44] FBI Investigates Human Trafficking At Madison Hotel, WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[45] Suspects Busted in Anaheim Sex Ring, ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

h.   Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[46]

i.   In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[47]

j.   Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[48]

k.   Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[49]

l.   In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[50]

---

[46] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[47] Amanda Milkovits, Massachusetts Man Accused of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[48] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015)https://www.washingpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[49] Hsing Tseng, Seven Indicted by Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex-trafficking-ring-bust/.

[50] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

m. A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[51]

n. In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[52]

o. In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[53]

p. In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[54]

q. Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[55]

r. In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[56]

---

[51] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, Herald Net (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[52] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, News Mississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

[53] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

[54] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex-traffickers-inhumanity/.

[55] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[56] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

163.    This sampling of news stories, reviews, and other public information establishes that, at the time Plaintiffs were trafficked at the subject properties, G6 Defendants and Motel 6 Location Defendants knew or should have known that:

    a.  There was widespread and ongoing sex trafficking occurring at the G6 branded properties;

    b.  Sex trafficking was a brand-wide problem for G6 Defendants;

    c.  G6 franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking and harboring trafficking at the branded hotel properties; and

    d.  G6 and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

164.    G6 Defendants and Motel 6 Location Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject Motel 6 locations.

165.    Internet reviews for the subject Motel 6 locations named herein, which G6 Defendants and Motel 6 Locations Defendants managed, controlled, and monitored, show the pervasiveness of sex trafficking before and after Plaintiffs were trafficked. Here are just a few examples:

- Motel 6 located at 20651 Military Rd S., Seattle, WA 98188

    o   2017 Trip Advisor review "Very sketchy people outside hanging out in the parking lot late at night. Drug dealing?? First time here in Seattle and not a good choice for a hotel. Girl at the desk not too friendly."[57]

---

[57] MOTEL 6 SEATTLE SOUTH - Prices & Reviews (SeaTac, WA) (tripadvisor.com)

- 2018 Yelp review "Every kind of criminal you ever heard of lodges here. Heroin and meth are sold from certain rooms or in the parking lot. There are always hookers around…"[58]
- Motel 6 located at 16500 Pacific Highway, Seattle, WA 98188
  - 2013 Yelp review "…AVOID THIS PLACE unless you are a crackhead, meth freak, prostitute or are looking to be violated in some way. I honestly can't believe this passes for a motel, as the majority of the people wandering the halls during my stay were DEFINITELY there for reasons other than just needing a place to stay."[59]
  - 2018 Trip Advisor review states: "I'm a recent retired LTC from the US ARMY (AOC J.A.G.) and cancer patient, who stayed at this Motel 6 for a total of 10 weeks . . Racism, preferential treatment, fraud, drug/prostitution activity, and lack of integrity all seem to be issues caused by/exacerbated by these employees. . . I'd look elsewhere if the choice is yours, if not ... sleep with one eye open!
  - 2015 Yelp review 8 states: "I'm pretty sure that this motel is a staging area for prostitution. Seems like some gals were staying here with their pimps. The area is notorious for prostitution. That said, the rooms looked new and we're clean. The staff was friendly. It's good for a night if you have an early flight out of Seatac."[60]
  - 2015 Yelp review states: "There's a whole bunch of people in and out of this motel, walking around, driving around mind you these

---

[58] https://www.yelp.com/biz/motel-6-seattle-south-seatac?start=10&rr=1
[59] https://www.yelp.com/biz/motel-6-seattle-seattle
[60] https://www.yelp.com/biz/motel-6-seattle-airport-seattle?start=30

people aren't even staying at the hotel, they'll look at you weird and make you feel super uncomfortable."[61]

- o 2013 Yelp review states: "here were prostitutes swarming around, one of which knocked on our door while we were packing. My husband said, "who is it?" and the cracking voice on the other side of the door said, 'Summer.'"[62]

- Motel 6 located at 18900 47th Avenue, SeaTac, WA 98188

  - o 2017 Trip Advisor review states "Our room was very noisy most of the night and the beds were very uncomfortable. Drug dealers and prostitutes were staying at the hotel. By this time it was dark and I did not feel safe going outside so I locked the door and stayed for the night and hoped for the best. It felt very unsafe. DO NOT STAY AT THIS HOTEL. Next morning I was just grateful to be alive and that my car had not been broken into or stolen."[63]

  - o 2016 Trip Advisor review states "The motel is overpriced for what you get, and while I was there a few days I saw shady characters all around, a guy sleeping in his car in the parking lot, a prostitute enter the motel for her "work," druggies, and some yelling in the hallways."[64]

  - o 2016 Trip Advisor review states "Checked into the room with strange people lurking around. I thought with best hopes that maybe they were secretly filming a zombie movie. But then I realized it was just people most likely high on heroin bumping into

---

[61] https://www.yelp.com/biz/motel-6-seattle-airport-seattle?start=70
[62] https://www.yelp.com/biz/motel-6-seattle-airport-seattle?start=40
[63] https://www.tripadvisor.com/Hotel_Review-g58732-d243759-Reviews-or50-Motel_6_Seattle_WA_Sea_Tac_Airport_South-SeaTac_Washington.html
[64] https://www.tripadvisor.com/Hotel_Review-g58732-d243759-Reviews-or50-Motel_6_Seattle_WA_Sea_Tac_Airport_South-SeaTac_Washington.html

the walls cuz they couldn't find their rooms. The prostitutes outside my window yelling at me their prices. . ."[65]

o 2015 Yelp review states "…and like other reviews mentioned.. we did see some prostitutes in the parking lot.. DEFINITELY STAY AWAY!"[66]

o 2015 Yelp review states "We had the joy of having to listen to a prostitute bang everyone, after she was finished with her sexual marathon one of the men was drunk and returned to her room demanding money, a woman in a neighboring room stepped out and told them to shut up or she'd call the police, a brawl broke out and they were all arrested."[67]

o 2019 Yelp review states "I checked in at 12 so most of the drugs and prostitution was minimal. No one bothered me. Went into my room, locked the door, brushed my teeth and went to bed out cold."[68]

o 2022 Yelp review states "The whole experience was a NIGHTMARE! From what I witnessed... think this location is one that is frequented by prostitutes & the homeless."[69]

166.    G6 Defendants and Motel 6 Location Defendants knew Plaintiffs were being trafficked at the locations named herein by the many red flags present during their continued stays. Plaintiffs' traffickers paid for stays in cash, oftentimes were not required to present ID, paid for extended stays on a day-to-day basis, requested rooms away from other guest and/or the front desk, obvious signs of illegal drug use, obvious visible signs of physical abuse, do not disturb signs always up, frequent

---

[65] https://www.tripadvisor.com/Hotel_Review-g58732-d243759-Reviews-or60-Motel_6_Seattle_WA_Sea_Tac_Airport_South-SeaTac_Washington.html
[66] https://www.yelp.com/biz/motel-6-seattle-seattle?start=70
[67] https://www.yelp.com/biz/motel-6-seattle-seattle?start=30
[68] https://www.yelp.com/biz/motel-6-seattle-seattle?start=10
[69] https://www.yelp.com/biz/motel-6-seattle-seattle?start=10

requests for new linens and towels but not letting cleaning staff into the rooms, men waiting out of the room while other men were inside with Plaintiffs for short periods of time.

## 2. Wyndham Hotels and Resorts and Hawthorn Suites Defendant's Knowledge of Sex Trafficking at Their Location

167.    Wyndham has also put out several public statements over the past ten to fifteen years indicating they know that sex trafficking is a problem in the hotel industry and at their hotels and claiming they are committed to fight against it.

168.    Defendant Wyndham signed "the code" several years ago and thereby promised to adopt policies to combat trafficking.[70] Yet they have failed to implement most, if not all of these policies.

169.    Defendant Wyndham is a face and signor of the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created mandatory Brand standards to be mandated at its branded properties, but it should also have enforced them. Despite Wyndham's direct and vicarious knowledge of trafficking at its hotels, it did not create, implement or enforce effective standards to prevent the trafficking it knew its properties were facilitating.

170.    Despite reports, police activity and investigation of trafficking, and the direct knowledge of trafficking at the subject Wyndham branded property, Wyndham did not change its ways or policies and procedures no matter how many people it hurt.

---

[70] See *Our Code Member,* ECPAT, https://www.ecpatusa.org/code-members

171.     Wyndham has been named in numerous civil lawsuits arising out of sex trafficking at their properties, including during the trafficking of Plaintiff B in this case, which puts Wyndham on further notice to the sex trafficking.

172.     Internet reviews for the subject Hawthorn Suites location named herein, which Wyndham and Hawthorn Suites Defendants reviewed, read, managed, controlled, and monitored show the pervasiveness of drugs and activity consistent with trafficking before and during the time Plaintiff B was trafficked. Here are just a few examples:

- 2019 Tripadvisor review states "As a business traveler for 35 years I have tons of real world experience staying at all brands and luxury levels of hotels. In over 3000 hotel stays, this property rates in the bottom worst 5 for me. Filth, unkempt, no maintenance, missing and broken items, etc. Police on property regularly with drug problems, prostitution, and even gunshots!"

- 2019 Tripadvisor review states "…Drug deal, prostitution, high school party, and a friend's car was broken into all on a Saturday night. I am just seriously amazed at how bad it was."

- 2018 Google review sates "…we were leaving around 4am to get out flight and easily a dozen people were still up and outside doing 'nothing'- looking drunk-high-unkempt and up to no good."

- 2018 Google review states "This place is scary. Used to stay here 15 years ago when the place was nice stayed recently and if you want hookers and drugs this is the place to stay. I was propositioned a few times…"

173.     Wyndham Defendants and the named Hawthorn Location Defendant knew Plaintiff B was being trafficked at the location named herein by the many red flags present during her continued stays. Plaintiff B's trafficker paid for stays in cash, oftentimes was not required to present ID, paid for extended stays on a day-to-

day basis, requested rooms away from other guest and/or the front desk, obvious signs of illegal drug use, obvious visible signs of physical abuse, do not disturb signs always up, frequent requests for new linens and towels but not letting cleaning staff into the rooms, men waiting out of the room while other men were inside with Plaintiff B for short periods of time.

### 3. Choice Hotels International, Inc. and Quality Inn Hotel Defendants' Knowledge of Sex Trafficking at Their Locations

174.    Choice Hotels International, Inc. has also put out several public statements over the past ten to fifteen years indicating they know that sex trafficking is a problem in the hotel industry and at their hotels and claiming they are committed to fight against it.

175.    Despite reports, police activity and investigation of trafficking, and the direct knowledge of trafficking at the subject Choice branded property, Choice did not change its ways or policies and procedures no matter how many people it hurt.

176.    Choice has been named in numerous civil lawsuits arising out of sex trafficking at their properties, including during the time of trafficking of Plaintiff A in this case, which puts Choice on further notice to the sex trafficking.

177.    Internet reviews for the subject Quality Inn location named herein, which Choice and Quality Inn Defendants reviewed, read, managed, controlled, and monitored show the pervasiveness of drugs and activity consistent with trafficking before and during the time Plaintiff A was trafficked. Here are just a few examples:

- 2015 Google review states "Just awful! I called the customer svc line and let them know how badly this hotel represented Choice and they didn't care at all."

- 2015 Google review states "Location very seedy, access to all doors 24/7 without needing to scan card."

- 2015 Google review states "Staying in room 224? 1) Find the condoms behind the TV- Reported and there for 3 days."

- 2013 Google review states "This was not a relaxing stay, what must be noted in this review is that it is in an awful neighborhood, we were approached a number of times by hoodlum individuals, couples were fighting in the hallway, there were what I could assume were gang members in the parking lot, I was so nervous it was hard to sleep and I am by no means a sheltered individual. The bathroom was dirty, the pillow was ripped and stained, and you could hear arguing and yelling from multiple people all night and early into the morning. Definitely not a place for young children."

178.     Choice and the named Quality Inn Location Defendants knew Plaintiff A was being trafficked at the location named herein by the many red flags present during her continued stays. Plaintiff A's trafficker paid for stays in cash, oftentimes was not required to present ID, paid for extended stays on a day-to-day basis, requested rooms away from other guest and/or the front desk, obvious signs of illegal drug use, obvious visible signs of physical abuse, do not disturb signs always up, frequent requests for new linens and towels but not letting cleaning staff into the rooms, men waiting out of the room while other men were inside with Plaintiff A for short periods of time.

**Defendants are Jointly Responsible for the Trafficking of Plaintiffs**

179.     Parent Hotel Defendants and their subject Hotel Defendants were participants in a joint venture with each other, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

180.    Upon information and belief, the operation of the subject Motel 6s was part of a single unified operation by G6 Defendants. Upon information and belief, the subject Motel 6 locations shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, G6 Defendants acted jointly to own, operate, control, manage, and supervise the subject Motel 6 locations. As an integrated enterprise and/or joint venture, Defendants were separately and jointly responsible for compliance with all applicable laws.

181.    Upon information and belief, the operation of the subject Hawthorn Suites was part of a single unified operation by Wyndham Hotels and Resorts, Inc. Upon information and belief, Hawthorn Suites had a parent company, was subject to joint control, and operated as an integrated enterprise and/or as an alter-ego. Upon information and belief, Wyndham Hotels and Resorts, Inc acted to own, operate, control, manage, and supervise the subject Hawthorn Suites location. As an integrated enterprise and/or joint venture, Wyndham Hotels and Resorts, Inc and the subject Hawthorn Suites location were separately and jointly responsible for compliance with all applicable laws.

182.    Upon information and belief, the operation of the subject Quality Inn was part of a single unified operation by Choice Hotels International, Inc. Upon information and belief, Quality Inn had a parent company, was subject to joint control, and operated as an integrated enterprise and/or as an alter-ego. Upon information and belief, Choice Hotels International, Inc acted to own, operate, control, manage, and supervise the subject Quality Inn location. As an integrated enterprise and/or joint venture, Choice Hotels International, Inc and the subject Quality Inn location were separately and jointly responsible for compliance with all applicable laws.

**Defendants are Jointly and Severally Liable for Plaintiffs' Damages**

183.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Plaintiffs.

184.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Plaintiffs for past and future losses they suffered as a proximate result of their sexual exploitation and trafficking.

## CAUSES OF ACTION AGAINST DEFENDANTS

### Sex Trafficking under 18 U.S.C. § 1595

**1. Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a)**

185.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 184.

186.    Plaintiffs are victims of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

187.    Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

      a.  Violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals, including Plaintiffs, knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

      b.  Violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating

a venture that was engaged in violations under 18 U.S.C

§1591(a)(1) at its respective hotel properties.

188.    Violations of 18 U.S.C §1595(a) by each of the Defendants as

"perpetrators" operated, jointly, with other unlawful acts and omissions alleged in

this Complaint, to cause Plaintiffs to suffer substantial physical and psychological

injuries and other damages as a direct and proximate result of being trafficked and

sexually exploited at the Defendants' hotel properties.

## 2. Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).

189.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1

through 184, and 185 through 188.

190.    Plaintiffs are victims of sex trafficking within the meaning of 18 U.S.C

§§ 1591 and 1595(a) and are thus entitled to bring a civil action under the

"beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited

from participation in a venture that the person knew or should have, with

reasonable diligence, known was engaged in a violation of the TVPRA.

191.    Through acts and omissions described throughout this Complaint,

Defendants received a financial benefit from participating in a venture with each

other and traffickers, including Plaintiffs' traffickers, despite the fact that each

defendant knew or should have known that these traffickers were engaged in

violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) at Defendants'

properties, including the subject locations alleged in this Complaint. As more

specifically alleged above, Parent Hotel Defendants and Hotel Defendants took part

in a common undertaking and enterprise involving risk and potential profits, and

here, actual profits resulted.  Parent Hotel Defendants and Hotel Defendants'

employees had a direct association with the traffickers and knowingly facilitated

the traffickers, which, as shown more thoroughly in the incorporated allegations

above, showed a continuous business relationship between the trafficker and

Defendants such that the pattern of conduct appears to be a tacit agreement between them. Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

192.    Through the acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other in the operations of its respective hotel properties even though Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

193.    Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiffs to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

   **3.  Cause of Action: Vicarious Liability for TVPRA Violations (Parent Hotel Defendants).**

194.    Plaintiffs reallege and incorporates the allegations in Paragraphs 1 through 184, and 185 through 188, and 189 through 193.

195.    Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

196.    Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

197.    Hotel Defendants acted as the actual agents of Parent Hotel Defendants when operating its respective hotel properties and in committing the wrongful acts and inactions alleged herein.

198.    Through the wrongful acts and omissions described throughout this Complaint, Parent Hotel Defendants exercised or retained the right to exercise

systematic and day-to-day control over the means and methods used by its franchisee to operate its respective hotel property.

199.     Parent Hotel Defendants are vicariously liable for the TVPRA violations of its franchisees, the Hotel Defendants, and the subagents of such franchisees.

200.     Additionally, on information and belief, each of the Parent Hotel Defendants participated in a joint venture operating the subject Hotel Defendant locations. They had highly integrated operations at the hotels, shared revenue and profits generated from the hotels, and exercised mutual control over the venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another and are therefore each directly and proximately liable for the harms and damages caused to Plaintiffs as a result.

## JOINT AND SEVERAL LIABILITY

201.     "Joint and several liability 'applies when there has been a judgment against multiple defendants.'"[94] If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recovers only once for the full amount.[95]

202.     Federal law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, without regard to his proportion of fault and even if the concurrent negligence of others contributed to the incident.[96]

---

[94] *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994).
[95] See 735 ILCS 5/2-1117; see Restatement (Second) of Torts § 875 (1977); *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).
[96] *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) (citations omitted); *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).

203.     Plaintiffs allege Defendants', and each of them, should be held joint and severally liable to Plaintiffs for the totality of their injuries and damages alleged herein.

## DAMAGES

204.     Defendants' wrongful acts and omissions described above, individually and collectively, caused Plaintiffs to sustain legal damages.

205.     Plaintiffs did suffer the following injuries as a direct and proximate result of Defendants', and each of their, wrongful actions and inactions alleged herein, and as such Plaintiffs are entitled to be compensated for past and future personal injuries, non-economic damages, and economic damages, see, e.g., 18 U.S.C. §§ 1593, 1595, including:

    a.  actual damages;

    b.  direct damages;

    c.  incidental and consequential damages;

    d.  lost earnings and lost earning capacity;

    e.  necessary medical expenses;

    f.  life care expenses;

    g.  physical pain and suffering;

    h.  physical impairment;

    i.  mental anguish and emotional distress damages (until trial and in the future);

    j.  restitution;

    k.  unjust enrichment; and

    l.  disgorgement of profits.

206.     Plaintiffs are entitled to pre- and post-judgment interest at the maximum legal rates.

## PUNITIVE DAMAGES

207.    Plaintiffs are entitled to punitive damages under the applicable statutes against Defendants, and each of them, for each and every cause of action alleged herein, as a result of Defendants' outrageous, wanton, willful, and malicious conduct underlying Plaintiff's claims. See *Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011).

## ATTORNEY FEES

208.    Plaintiffs are entitled to recover their costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes. See 18 U.S.C. § 1595(a).

209.    All conditions precedent to Plaintiffs' recovery of its costs and attorneys' fees have occurred or will occur prior to entry of judgment in this suit.

## JURY DEMAND

210.    Plaintiffs request a jury trial in this action.

## PRAYER

211.    For these reasons, Plaintiffs pray that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiffs against Defendants jointly and severally, for:

    a.  all economic damages to which they are entitled;

    b.  all actual damages to which they are entitled;

    c.  all incidental and consequential damages to which they are entitled;

    d.  all mental anguish and emotional distress damages to which they are entitled;

    e.  all restitution damages to which they are entitled;

    f.  all disgorgement of profits to which they are entitled;

    g.  all unjust enrichment damages to which they are entitled;

h.  exemplary, treble, and/or punitive damages;

i.  attorneys' fees and costs of suit;

j.  pre-judgment and post-judgment interest at the highest rate
    allowed by law; and

k.  all other relief to which they are entitled in law or in equity.

SINGLETON SCHREIBER, LLP

Dated: August 16, 2024          By: _____

Gerald Singleton
Stephen Hill
Meagan Verschueren (CA 313117) Pro
Hac Vice applicant
Katie Llamas (CA 303983) Pro Hac Vice
applicant
Attorneys for Plaintiffs